1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| M.K., who sues through her parents, T.K. and S.K., | Case No. _____ |
| Plaintiffs, | COMPLAINT AND PETITION FOR JUDICAL REVIEW AND FOR RECOVERY OF ATTORNEYS' FEES AND COSTS UNDER IDEA |
| vs. | |
| ISSAQUAH SCHOOL DISTRICT, | and |
| Defendants. | PLAINTIFFS' COMPLAINT FOR DAMAGES |
| | (JURY DEMAND) |

Plaintiffs bring this action to appeal the Findings of Fact, Conclusions of Law, and Final Order ("Final Order") entered by Administrative Law Judge Dana Deiderich on March 7, 2024. This appeal is made pursuant to 20 U.S.C. § 1415(i)(2) and Wash. Admin. Code § 392-21172A-05115. Plaintiffs also assert discrimination claims based on the Issaquah School District's violations of § 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act, and the Washington Law Against Discrimination.

## I.    PARTIES

Appeal of Administrative Order
and Complaint for Damages

Page 1 of 19

Cedar Law PLLC
113 Cherry Street, PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

1.1     Petitioner/Plaintiff M.K. is an adult who was previously a student in the Issaquah School District but gave T.K. and M.K., who are her parents, power of attorney over her education decisions. To protect M.K.'s privacy, only her initials and her parents initials are used.

1.2     Plaintiffs T.K. and S.K. reside and have resided at all times relevant to this action within the District's boundary lines in Issaquah, Washington, located in King County, Washington.

1.3     The Defendant Issaquah School District ("the Appellee/Defendant" or "the District") is a school district organized under the laws of the State of Washington and is located at 5150 220th Avenue SE, Issaquah, WA 98029.

## II.     JURISDICTION AND VENUE

2.1     This appeal of ALJ Deiderich's Final Order arises under the Individuals with Disabilities Education Act ("IDEA") 20 U.S.C. §1400 *et. seq*.; 28 U.S.C. §§ 2201 and 2202; and the state Education for All Act ("State Act") Chapter 28A.13 RCW; and the regulations promulgated thereunder. This Court possesses jurisdiction over the appeal pursuant to 20 U.S.C. § 1415(i)(2).

2.2     As a prerequisite to M.K.'s § 504 and ADA and claims, T.K. and S.K., on M.K.'s behalf, filed a special education due-process complaint with the Washington Office of Administrative Hearings.

2.3     The Plaintiffs' federal discrimination claims arise from § 504 of the Rehabilitation Act of 1973 ("§ 504 claims") and Title II of the Americans with Disabilities Act. Pursuant to 28 U.S.C. §§ 1331 and 1343(a), this Court possesses original jurisdiction over the Plaintiffs' § 504 claims and ADA claims pursuant to 28 U.S.C. §§ 1331 and 1343.

Cedar Law PLLC
113 Cherry Street, PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

2.4     Plaintiffs' state law claim arises from the Revised Code of Washington § 49.60 *et seq.*, which is the Washington Law Against Discrimination ("WLAD"). This Court may exercise supplemental jurisdiction over Plaintiffs' WLAD claim pursuant to 28 U.S.C § 1367.

2.5     All acts and omissions at issue occurred in the Western District of Washington. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b).

### III.    FACTUAL ALLEGATIONS

3.1     M.K., formerly a student in the Issaquah School District ("the District"), is person with a disability under IDEA, 20 U.S.C. § 1401(3) and regulations promulgated pursuant to it at 34 C.F.R. 300 *et seq.* as well as Washington's implementing regulations. At all times relevant to this action, M.K. was eligible for special education and related services under IDEA.

3.2     Plaintiffs initiated an administrative due process hearing regarding the provision of special education services to M.K., which was assigned Office of the Superintendent of Public Instruction Cause No. 2023-SE-0047 and Office of Administrative Hearings Docket No. 03-2023-OSPI-01824. An administrative hearing was held before Administrative Law Judge Dana Deiderich on December 6, 7, 8, and 11, 2023. The only two issues in the hearing were:

> Whether during the 2021-2022 school year, until Student's private placement, the District violated the IDEA and denied Student a FAPE by failing to provide her with an Individualized Education Program (IEP) that was reasonably calculated to meet her needs;
>
> and
>
> Whether the District materially failed to implement Student's IEP in 2022 by neglecting to offer an appropriate placement for 64 days;

*See* Exhibit A, *Findings of Fact, Conclusions of Law, and Final Order*, p. 2.

3.3     On March 7, 2024, ALJ Deiderich issued the Final Order, a copy of which is appended hereto as Exhibit A.

Cedar Law PLLC
113 Cherry Street, PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

**A.      Overview of M.K.'s Mental Health and Its Impact on Her Education**

3.4      ALJ Deiderich correctly found from the evidence that M.K. had a lengthy psychiatric and mental-health history. Exhibit A, *Final Order*, p. 4, ¶1. M.K. was diagnosed with depression and anxiety around the age of eleven. *Id*. She began experiencing suicidal ideations around the same age. *Id*. The Adult Student attempted suicide at age 11 and again at age 13. *Id*. In 2015, M.K. began seeing Dr. John Pastor, a psychiatrist, who treated M.K. until early 2022. *Id*. at 5, ¶2.

3.5      Between 2015 and 2017, M.K. continued struggling with anxiety and depression and experienced suicidal ideations, and her parents eventually withdrew her from school for treatment. *Id*. at 5, ¶3.

3.6      M.K. re-enrolled in the District for 2018-2019 school year, and she continued experiencing anxiety and depression. *Id*. at 5, ¶5.

3.7      M.K. remained enrolled in the 2019-2020 school year but her mental health impairments worsened. *Id*. at 5, ¶6. In January and February 2020, M.K.'s parents met with the Issaquah High School's Guidance Team "to discuss their concerns regarding [M.K.'s] increased anxiety, which was causing [her] to avoid school and to become 'overwhelmed with initiating and completing school tasks.'" *Id*. at 5, ¶7. And, at this time, it was M.K.'s parents who "were providing daily support to allow to [M.K.] at this time to allow her receive passing grades." Exhibit A, *Final Order*, p. 5, ¶7.

3.8      M.K.'s 2020-2021 school year was no better. She was unable to complete several classes and managed only very poor grades. In March 2021, Dr. Pastor, M.K.'s psychiatrist, diagnosed her with "recurrent major depressive disorder in partial remission; obsessive-compulsive disorder, unspecified type; social phobia, generalized; parent-child relational

Cedar Law PLLC
113 Cherry Street, PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

problem; and post-traumatic stress disorder-rule out."[1] *Id*. at 6, ¶12.

### B.    M.K.'s 2021 Eligibility for Special Education Services

3.9    It was also in March 2021 that M.K.'s mother asked the District to evaluate M.K. for special education eligibility. *Id*. at 6, ¶13. The referral form indicated the areas of concern were behavioral and social/emotional, and indicated that M.K.'s "level of engagement, motivation and grades have significantly declined this year despite moving to a partial schedule and having support from a 504 Accommodation plan." *Id*. at ¶13. A month later, the District determined that M.K. was eligible for special education services and determined that that M.K. required "specially designed instruction (SDI) in the area of social/emotional." *Id*. at 7, ¶16.

3.10    M.K. accumulated a total of 52 unexcused absences during her 2020-2021 school year. *Id*. at 9, ¶23. Between late spring and summer of 2021, the District and M.K.'s parents exchanged information about M.K. and proposals for interventions intended to get M.K.'s academic future back on track, but M.K. was unable to engage in her schoolwork. *Id*. at 9, ¶¶ 24-26. Although M.K. was enrolled in summer school in 2021, she stopped attending classes and began using alcohol and marijuana. *Id*. at 9, ¶¶27-28.

### C.    M.K.'s 2021-2022 School Year, Attempted Suicide, and Placement at The Meadows

3.11    In the late summer or early fall of 2021, Dr. Pastor, M.K.'s psychiatrist, determined that post traumatic stress disorder ("PTSD") was M.K.'s primary diagnosis. *Id*. at 10, ¶30.  In August 2021, M.K.'s parents began speaking with Dr. Pastor about whether she might need placement at a residential program to access her education. *Id*. at 10, ¶32. Dr. Pastor believed that even 1:1 instruction in all classes might not be appropriate for M.K. due to her significant impairments, and residential placement could be necessary. *Id*. Dr. Pastor was

---

[1] A "rule out" diagnosis is one that a psychiatrist is considering for the patient. Exhibit A, p. 6, FN 8.

Cedar Law PLLC
113 Cherry Street, PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

concerned about the M.K.'s worsening ability to engage with her academics and her increasing avoidant and risk-taking behaviors. *Id.*  On September 14, 2021, the District's school psychologist spoke with Dr. Pastor over the phone about M.K. and during the telephone conversation, Dr. Pastor shared that M.K.'s difficulties stem from anxiety, shame avoidance, and perfectionist tendencies. *Id.* at 12, ¶39.  Dr. Pastor stated that he did not know if 1:1 instruction would be sufficient for M.K. and stated that a residential placement might be necessary. *Id.*

3.12    At the time that Dr. Pastor spoke with the District's school psychologist, M.K. had already missed meetings with District staff and had not attended school.  On September 9, 2021, T.K. emailed the District stating that M.K. missed six of the last eight school days due to school refusal.  Ms. Leon, M.K.'s special education case manager at the time, replied to T.K.'s email. *Id.* at 11, ¶¶35, 37.

3.13    After Dr. Pastor spoke with the District's school psychologist about Student, T.K. continued to email the District the same week providing notice of M.K. struggling and not attending school. *Id.* at 12, ¶¶40, 43.

3.14    On September 16, 2021, M.K.'s school counselor at the time described M.K. in an email to a District teacher as "SO sweet, but very fragile and tends to be absent a lot." *Id.* at 12, ¶42.

3.15    In September 2021, Dr. Gayle Fay undertook a neuropsychological independent education evaluation ("the IEE") on M.K. and diagnosed her with attention deficit disorder – severe, dysthymia (generalized, chronic depressive disorder), generalized anxiety disorder, social anxiety disorder, and disruptive mood dysregulation disorder. *Id.* at 13, ¶48.  Despite the fact that M.K. demonstrated some academic strengths and impressive intellectual and problem

Cedar Law PLLC
113 Cherry Street, PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

solving skills, Dr. Fay found that M.K. exhibited "a significant constellation of deficits which will necessitate 1:1 intervention as well as accommodations in educational environments." *Id.* at 13, ¶49. Dr. Fay noted, for example, that M.K. "'has reduced motor and information processing speed' that is 'amplified by her severe Attention Deficit Disorder,' 'is hypervigilant to error,' 'loses focus due to attention issues and that maintaining attention across a whole series of auditory tasks can be very difficult for her.'" *Id.* at 13-14, ¶49.  Dr. Fay opined that M.K.'s "'[hypervigilance] to error . . . triggers pervasive performance anxiety as well as expectations to be unsuccessful in the educational setting.'" Dr. Fay met with M.K.'s IEP team and explained to them that M.K.'s "appropriate educational environment" would be a "full time 1:1 [teacher-student ratio] setting" and that "'a regular classroom will put [M.K.] behind very quickly.'" *Id.* at 14, ¶55.

3.16    In December 2021, M.K.'s parents advised M.K.'s IEP team "that her mental health was deteriorating and that her anxiety and depression were increasing." *Id.* at 17, ¶68. They reported M.K. was experiencing suicidal ideations and the longer M.K. was out of school, the worse her mental health deteriorated. *Id.*  M.K. continued to struggle with class attendance and participation. She ended up failing all of her classes in the District for the 2021-2022 school year. *Id.* at ¶79.

3.17    In February 2022, M.K.'s parents advised M.K.'s IEP team in a lengthy letter that M.K. continued to struggle with her mental health, that M.K. felt shameful because she was not attending school, and that M.K.'s challenges "were spiraling out of control." *Id.* at 18-19, ¶81.  M.K.'s parents requested an IEP meeting to see what M.K.'s IEP team could do to help her. *Id.* at 19, ¶81.

3.18    Soon after M.K.'s parents updated her IEP team, M.K. attempted suicide and

Cedar Law PLLC
113 Cherry Street, PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

was admitted to Overlake Hospital.

3.19    M.K.'s parents advised the District that they intended to place M.K. at The Meadows, which is a 45-day inpatient program for young adults struggling with addiction, emotional trauma, and mental health issues. *Id*. at 20, ¶86. Substance abuse was not the primary reason for M.K.'s treatment at The Meadows. *Id*. at 21, ¶93.

3.20    The Meadows does not provide academic instruction. *Id*. at 21, ¶91. However, the purpose of M.K.'s placement there was for her to recover enough to be able to access and re-engage in her education.    According to Dr. Pastor, M.K.'s disabilities resulted in "in unconscious, intense efforts to avoid feelings of inadequacy and shame" and caused M.K. to "set idealized and unhealthy expectations for herself, neglected and avoided the need for self-care and academic and psychosocial supports, and avoided, withdrew from or dissociated from tasks in which she felt inadequacy or shame, in particular academic work or instruction." *Id*. at 24, ¶116.    Critically, Dr. Pastor opined that M.K. required placement at The Meadows because she "'was unable to engage in any formal education'" and "'required a residential program to stabilize her severely degraded sense of self and ability to function before reengaging in an academic setting of any kind.'" *Id*. at 24, ¶118.    Dr. Pastor opined further that M.K. "could not be successful in any academic setting" without treatment at The Meadows. *Id*. M.K. required placement at The Meadows because "forced academics at that point would have led to 'additional academic failures, further psychological decline,' and prolonged need for residential placement." *Id*. Dr. Pastor opined that the 24-hour monitoring and structure of The Meadows was appropriate for M.K. because it would decrease M.K.'s "risks of avoidance, impulsivity, self-neglect, self harm, inappropriate seeking of peer connection." *Id*.

3.21    According to ALJ Deiderich, she "accorded significant weight" to Dr. Pastor's

Cedar Law PLLC
113 Cherry Street, PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

opinions because "[h]e was [M.K.'s] treating provider since 2015 and had frequent contact with [M.K and her parents] during the relevant time period." During the due-process hearing, the District did not call any psychiatrists or neuropsychologists as witnesses. Dr. Pastor's and Dr. Faye's testimonies were not challenged by any other physician or mental-health provider.

3.22    M.K.'s parents asked the District to fund her placement there, but the District declined. The parents paid $64,820 for M.K. to attend The Meadows. *Id.* at 21, ¶93.

3.23    ALJ Deiderich correctly determined that the District "denied [M.K.] a FAPE during the 2021-2022 school year by placing [M.K.] in an educational placement that was not reasonably calculated to meeting her needs." *Id.* at 32. However, ALJ Deiderich committed reversible error when she denied M.K.'s parents' claims for financial reimbursement for the costs of M.K.'s residential placement, the costs of M.K.'s psychiatric treatment, and the costs of M.K.'s neuropsychological IEE. ALJ Deiderich ruled that M.K.'s placement at The Meadows "was in response to an acute medical issue." *Id.* at 32, ¶18. In reaching these legal conclusions, ALJ Deiderich incorrectly applied the legal standard when she ruled that M.K.'s residential placement was "necessary for [M.K.'s] mental health" but that it "was not a proper education placement for purposes of tuition reimbursement." *Id.* at 29, ¶18.

3.24    The IDEA empowers a hearing officer "to order school authorities to reimburse parents for their expenditures" for their child's private placement if the hearing officer determines that the placement, rather than a proposed IEP, is "proper under the [IDEA]." *Sch. Comm. of Town of Burlington, Mass. v. Dept. of Educ. of Mass.*, 471 U.S. 359, 369 (1985) "To be 'proper,' the residential placement must have been (1) 'necessary for [the student] to receive benefit from her education' and (2) for educational purposes, rather than 'a response to medical, social, or emotional problems ... quite apart from the learning process,'" *Ashland School Dist. v.*

Appeal of Administrative Order
and Complaint for Damages

Page 9 of 19

Cedar Law PLLC
113 Cherry Street, PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

*Parents of Student R.J.*, 588 F.3d 1004, 1010 (9th Cir.2009)(*quoting Clovis Unified School Dist. v. Cal. Office of Admin. Hearings*, 903 F.2d 635, 643 (9th Cir.1990)).   The Plaintiffs respectfully submit that they proved by a preponderance of the evidence that M.K.'s placement at The Meadows was, according to Dr. Pastor and Dr. Fay, "necessary" for M.K. "to receive benefit from her education" and that her placement was for "educational purposes" because her medical and emotional problems were intertwined with her educational problems and her placement was an absolute prerequisite for her to benefit from her special education.

3.25    Additionally, the ALJ errored in her application of the law and the facts when determining that M.K. was not entitled to compensatory education.  Moreover, the ALJ errored in her application of the law and the facts when determining that M.K. was not entitled to compensatory education in the form of reimbursement for tuition and costs related to The Meadows and for Dr. Pastor's and Dr. Fay's services.

3.26    Lastly, the ALJ errored in her application of the law and the facts when determining that M.K. was not entitled to relief for the District's delay in offering an appropriate placement to M.K.

3.27    The IDEA provides an appeal of the ALJ Decision as a matter of right. Specifically, 20 U.S.C. § 1415(i)(2)(A) states:

> Any party aggrieved by the findings and decision made under subsection (f) or (k) who does not have the right to an appeal under subsection (g), and any party aggrieved by the findings and decision made under this subsection, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy.

3.28    This right to appeal also is set forth in the Washington Administrative Code at Wash. Admin. Code § 392-172A-05115(1), which states:

Appeal of Administrative Order
and Complaint for Damages

Page 10 of 19

Cedar Law PLLC
113 Cherry Street, PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

> Any party aggrieved by the findings and decision made under WAC 392-172A-05105 through 392-172A-05110 or 392-172A-05165 has the right to bring a civil action with respect to the due process hearing request. The action may be brought in any state court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy.

3.29    The Petitioners bring this appeal pursuant to the above-stated provisions.

3.30    If their appeal is successful, Plaintiffs will be entitled to their attorneys' fees and costs for the matter that gives rise to this appeal as well as the appeal. Accordingly, pursuant to 20 U.S.C. § 1415(i)(3)(B), Plaintiffs request the Appellee/Defendant be ordered to reimburse Plaintiffs for all attorneys' fees and costs accrued to date and in the future as it relates to the underlying action that gives rise to this appeal, the appeal, and any matters related to this appeal.

## IV.    CAUSES OF ACTION

### Count 1: Appeal of Administrative Order Under the IDEA

4.1    The factual allegations set forth in the above paragraphs are and incorporated by reference.

4.2    It is the position of the Plaintiffs that ALJ Deiderich's Final Order does not contain any factual errors that compel an appeal.  In her Final Order, ALJ Deiderich specifically found that the District denied M.K. a FAPE during the 2021-2022 school year. However, ALJ Deiderich erroneously concluded that T.K., S.K., and M.K. were not entitled to their requested relief, which was reimbursement for the costs of M.K.'s placement at The Meadows, the costs of M.K.'s mental health treatment provided by John Pastor M.D., and the costs of M.K.'s neuropsychological evaluation from Gayle Fay, Ph.D.

4.3    ALJ Deiderich's incorrectly applied the legal standards governing reimbursement and, as a consequence, erroneously concluded that T.K. and M.K. should not be

Appeal of Administrative Order
and Complaint for Damages

Page 11 of 19

Cedar Law PLLC
113 Cherry Street, PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

reimbursed for the above-listed costs.

4.4    The Plaintiff is aggrieved by ALJ Deiderich's Final Order, are entitled to appeal that decision, and should, on appeal, be deemed the prevailing party.

4.5    As prevailing party, the Parents are entitled to their reasonable attorneys' fees and costs.

### Count 2: Claims for Damages Due to Violations of the Americans With Disabilities Act and § 504 of the Rehabilitation Act of 1973

5.1    The factual allegations set forth in the above paragraphs are and incorporated by reference.

5.2    The claims in Count 2 are civil rights claim against the District for damages.

5.3    Because M.K. suffers from mental and behavioral/emotional disabilities, she is cognitively and emotionally "disabled" within the meaning of both the Americans With Disabilities Act ("ADA") and under § 504 of the Rehabilitation Act of 1973 ("§ 504").

5.4    M.K. falls into the class of persons whose rights are specifically protected by both statutes.

5.5.    At all times material to this case, the District knew that M.K. disabled within the meaning of both the ADA and § 504.

5.6    Title II of the ADA provides: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

5.7.    Section 504(a) states: "No otherwise qualified individual with a disability in the United States shall, solely by reason of her or his disability, be excluded from the participation

Cedar Law PLLC
113 Cherry Street, PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a) (codifying§ 504).

5.8     The District receives money from the United States government to assist with the provision of a free, appropriate public education to students like M.K. and, pursuant to § 504, was required to provide M.K. with a FAPE.

5.9     Because the District receives this money, the District cannot discriminate against M.K. on the basis of her disabilities.

5.10     As is set forth in the preceding fact sections, the District discriminated against M.K. on the basis of her disabilities in the following ways:

A.     denied M.K. a free appropriate public education;

B.     excluded M.K. from the classroom and educational resources;

C.     failed to accommodate M.K.'s needs as a student with a disability;

D.     prevented M.K. from participating in and fully accessing the benefits of the District's educational programs and activities; and

E.     segregated M.K. from other students on the basis of her disabilities by denying M.K. access to school by failing to provide her with reasonable behavioral and academic supports.

5.11     M.K. belongs to the class of persons whom the ADA and § 504 were intended to protect.

5.12     Persons employed by the District possessed actual notice of the discrimination and the possibility of other discrimination.

5.13     The District employees who possessed notice included M.K.'s special-education teacher, M.K.'s general education teachers, the District special-education

Cedar Law PLLC
113 Cherry Street, PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

coordinator and her assistants, the District's § 504 coordinator, and Issaquah High School administrators.

5.14    Each of the above-listed persons possessed the authority to investigate, deter, and/or stop the discriminatory conduct but intentionally failed to do so or were deliberately indifferent to the discrimination.

5.15    The District's discriminatory conduct effectively excluded M.K. from participating in, and receiving full access to, the benefits of the District's programs and activities.

5.16    The District's conduct was purposeful, done in bad faith, carried out with a discriminatory animus, and amounted to intentional discrimination against M.K. on the basis of her disability and in violation of the ADA, § 504, and their implementing regulations.

5.17    As a result of the District's conduct, M.K. sustained the following damages:

A.    denied M.K. a free appropriate public education;

B.    the District excluded M.K. from the classroom and educational resources;

C.    the District failed to accommodate M.K.'s needs as a student with a disability;

D.    the District prevented M.K. from participating in and fully accessing the benefits of the District's educational programs and activities;

E.    the District segregated M.K. from other students on the basis of her disabilities by denying M.K. access to school by failing to provide her with reasonable behavioral and academic supports;

F.    M.K. lost the educational opportunities enjoyed by other Students who do not have disabilities;

G.    M.K. suffered mental anguish and emotional distress, including fear,

Appeal of Administrative Order
and Complaint for Damages

Page 14 of 19

Cedar Law PLLC
113 Cherry Street, PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

nervousness, sadness, fright, anxiety, humiliation, shock, shame, embarrassment, apprehension, and ordeal;

H.   loss of enjoyment of life; and

I.   loss of dignity.

5.18   If M.K., T.K., and S.K. prevail, the are entitled to their reasonable attorneys' fees and costs.

### Count 3: Claims for Damages Due to Violations of the Washington Law Against Discrimination

6.1   The factual allegations set forth in the above paragraphs are and incorporated by reference.

6.2   The WLAD guarantees the right to the full enjoyment of all accommodations, advantages, facilities and privileges of attendance in public schools, without discrimination. The WLAD forbids places of public accommodation, like public schools, from depriving disabled persons from services and access comparable to those provided to non-disabled persons.

6.3   M.K. is a member of a protected class because she is a student with a disability.

6.4   The District's schools and establishments are places of public accommodation.

6.5   The District discriminated against M.K. when it did not treat her in a manner comparable to the treatment it provides to persons who do not have disabilities.

6.6   M.K.'s protected status was a substantial factor that caused the discrimination.

6.7   The WLAD imposes strict liability for discrimination in advantages and facilities of places of public accommodations.

6.8   The District is responsible for the conduct of its employees because they were

Appeal of Administrative Order
and Complaint for Damages

Page 15 of 19

Cedar Law PLLC
113 Cherry Street, PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

employees or agents of the District at all materials times, their acts and omissions were carried out within the course and scope of their employment with the District, and the District ratified their conduct.

6.9     The WLAD prohibits discrimination in a place of public accommodation on the basis of disability.

6.10     The District is a place of public resort, accommodation and assemblage, or amusement under the WLAD.

6.11     All employers subject to WLAD public accommodations claims, including school districts, are strictly liable for the actions of their employees.

6.12     As a result of the District's conduct, M.K. sustained the following damages:

A.     the District denied M.K. a free appropriate public education;

B.     the District excluded M.K. from the classroom and resources;

C.     the District failed to accommodate M.K.'s needs as a student with a disability;

D.     the District prevented M.K. from participating in and fully accessing the benefits of the District's educational programs and activities;

E.     the District segregated M.K. from other students on the basis of her disabilities by denying M.K. access to school by failing to provide her with reasonable behavioral and academic supports;

F.     M.K. lost the educational opportunities enjoyed by other students who do not have disabilities;

G.     M.K. suffered mental anguish and emotional distress, including fear, nervousness, sadness, fright, anxiety, humiliation, shock, shame, embarrassment, apprehension, and ordeal;

Cedar Law PLLC
113 Cherry Street, PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

H.    loss of enjoyment of life; and

I.    loss of dignity.

6.13    If M.K., T.K., and S.K. prevail, the are entitled to their reasonable attorneys' fees and costs.

## V.    REQUEST FOR RELIEF

7.1    Based on the foregoing, the Plaintiffs request:

A.    that the Court reverses the erroneous legal rulings in ALJ Deiderich's Final Order;

B.    that the Court awards to the Plaintiffs the relief they sought in the special education due process case, which is reimbursement of the costs of M.K.'s placement at The Meadows, the costs of Dr. Pastor's treatment, and the cost of Dr. Fay's IEE;

C.    that the Court declares that the Plaintiffs are the prevailing parties in the underlying special education due process action and in the instant appeal;

D.    that the Court awards Plaintiffs their recoverable costs and reasonable attorneys' fees incurred in the underlying special education due process action and in the instant appeal and any additional fees incurred in this action to prosecute and enforce their right to an award of attorneys' fee pursuant to 20 U.S.C. § 1415(i)(3)(B);

E.    that the Court assumes jurisdiction of all of M.K.'s civil rights/damages claims;

F.    that the Court orders a trial before a struck jury on all claims triable by a jury;

G.    for the jury to award to her compensatory, general, and special damages permitted by state and federal law against the District;

H.    for the Court to enter judgment against the District;

I.    where and when permitted by state and federal law, for the Court to award

Appeal of Administrative Order
and Complaint for Damages

Page 17 of 19

Cedar Law PLLC
113 Cherry Street, PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

attorneys' fees and costs to M.K. and against the District in her civil rights/damages claims;

      J.    and, as justice dictates, for the Court to grant any other relief deemed necessary or appropriate by the Court.

## VI.    JURY DEMAND

Plaintiffs demand a trial by a struck jury.

CEDAR LAW PLLC

_____

Ryan Ford, WSBA No. 50628
Attorneys for the Plaintiffs
Cedar Law PLLC
113 Cherry St., PMB 96563,
Seattle, WA 98104-2205
(206) 607-8277 [tel]
(206) 237-9101[fax]
ryan@cedarlawpllc.com

BO JOHNSON LAW LLC

    s/ Bo Johnson
_____

William T. "Bo" Johnson III
WSBA No. 54856
Attorneys for the Plaintiffs
Bo Johnson Law LLC
P.O. Box 361847
Hoover, AL 35236
(205) 706-4431[tel]
(509) 478-1785 [fax]
bojohnsonlaw@gmail.com

Appeal of Administrative Order
and Complaint for Damages

Page 18 of 19

Cedar Law PLLC
113 Cherry Street, PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## REQUEST FOR SERVICE

Plaintiffs request that the Appellee/Defendant be served by certified mail at the following address:

Issaquah School District
5150 220th Avenue SE
Issaquah, WA 98029

Cedar Law PLLC
113 Cherry Street, PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

**Exhibit A**

**WASHINGTON STATE**
**OFFICE OF ADMINISTRATIVE HEARINGS**

| In the matter of: | Docket No.   03-2023-OSPI-01824 |
|---|---|
| Issaquah School District | **FINDINGS OF FACT,**<br>**CONCLUSIONS OF LAW,**<br>**AND FINAL ORDER** |
| | Agency:      Office of Superintendent of<br>                   Public Instruction<br>Program:    Special Education<br>Cause No.   2023-SE-0047 |

A due process hearing was held before Administrative Law Judge (ALJ) Dana Diederich on December 6 – 8, and 11, 2023, via videoconference. The Parents of the Adult Student whose education is at issue[1] appeared and were represented by Ryan Ford and William "Bo" Johnson, attorneys at law. The Issaquah School District (District) was represented by Susan Winkelman, attorney at law. Also present for the District was Sharine Carver, Executive Director of Special Services.

<u>STATEMENT OF THE CASE</u>

**Procedural History**

The Parents[2] filed a due process hearing request with the Office of Administrative Hearings (OAH) on March 6, 2023.  The complaint was given Cause No. 2023-SE-0047 and assigned to ALJ Courtney Beebe.  The complaint was reassigned to ALJ Diederich on March 22, 2023.  ALJ Diederich issued a prehearing order setting out the issues for hearing on April 11, 2023.  ALJ Diederich issued an order setting the due process hearing for December 4 – 8, and 11, 2023.[3]

**Due Date for Written Decision**

The deadline for a written decision in this case was extended at the Parents' request to thirty days after the record of the hearing closes.  The hearing ended on December 11, 2023, and the record closed on February 9, 2024, when the parties timely filed post-hearing briefs.  The due date for a written decision is March 10, 2024.

---

[1] To ensure confidentiality, names of parents and students are not used.  Instead, they are identified as "Parents," "Mother," "Father," or "Adult Student."

[2] The Parents have power of attorney over educational decisions for the Adult Student. D18p28-31.

[3] ALJ Diederich struck the first two days set for the due process hearing by order dated December 4, 2023.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0047
Docket No. 03-2023-OSPI-01824
8612 - OSPI
Page 1

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

<u>EVIDENCE RELIED UPON</u>

**Exhibits Admitted:**

District's Exhibits: D1 – D36

Parents' Exhibits: P1 – P7; P9 (pages 1 – 18 only); P10 – P19; P23 – P31; P33; P35; P38 – P39; P41 – P48; P51; P53; P54; P54A; P54B; P54C (pages 2, 3, 5, 6, 8, 9, and 10 only); P54D; and P55 – P56.

**Witnesses Heard (in order of appearance):**

Dr. John Pastor
Dr. Gayle Fay
Melinda Mechler – District School Psychologist
Erin Connolly – District Principal
Adult Student
Mother
Mackenzie Jeffrey –Therapist at The Meadows
Ryan McGlynn – District Social Worker
Joan Lawson – Director of Special Services
Christian McKone – District School Counselor
Father
Kari Leon – District Special Education Teacher
Dorothy Bearson – Re-Engagement Specialist at Brooks Powers Group
Tammy Unruh – District Secondary Special Services Director

<u>ISSUES</u>[4]

a) Whether the District violated the Individuals with Disabilities Education Act (IDEA) by failing to offer Student a Free and Appropriate Public Education (FAPE) as follows:

1. Whether during the 2021-2022 school year, until Student's private placement, the District violated the IDEA and denied Student a FAPE by failing to provide her with an Individualized Education Program (IEP) that was reasonably calculated to meet her needs;

2. Whether the District materially failed to implement Student's IEP in 2022 by neglecting to offer an appropriate placement for 64 days;

---

[4] Several issues were struck prior to the due process hearing by agreement of the parties. Those issues are indicated using strikethrough and will not be further addressed in this order.

3. ~~Whether the District materially failed to implement Student's IEP in 2022 by delaying the provision of academic services through Fusion Academy;~~

4. ~~Whether the District materially failed to implement Student's IEP during 2022 and 2023 by failing to provide Student with specially designed instruction and appropriate oversight over all specially designed instruction identified in Student's IEP;~~

5. ~~The District's failure to fund the recommended related service of brain mapping for Student;~~

6. ~~The District predetermined that it would not provide Student with the brain mapping service recommended by Student's provider.~~

b) And, whether the Adult Student is entitled to the following requested remedies:

1. Declaratory relief that the District violated the IDEA and denied Student a FAPE;

2. Declaratory relief that the District acted with deliberate indifference and violated Section 504 of the Rehabilitation Act of 1973 based on the findings of the presiding hearing officer;

3. Declaratory relief that the District violated the Americans with Disabilities Act based on the findings of the presiding hearing officer;

4. Declaratory relief that the District violated 42 USC § 1983 based on the findings of the presiding hearing officer;

5. An Order that the District provide reimbursement to Parents for Student's treatment at The Meadows, including the cost of treatment and all other related costs;

6. An Order that the District provide reimbursement to Parents for expenses in connection with obtaining an evaluation report by Dr. Fay;

7. An Order that the District provide reimbursement to Parents for expenses in connection with Student's treatment at Evoke at Entrada LLC, including the cost of treatment and all other related costs;

8. An Order that the District provide reimbursement to Parents for expenses connected to obtaining psychiatric care for Student through Dr. Pastor of Interlake Psychiatric Associates between 2/24/2021 and 6/7/2022;

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0047
Docket No. 03-2023-OSPI-01824
8612 - OSPI
Page 3

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

9.   An Order that the District provide reimbursement for and fund all related services previously and currently owed to Student;

10.  An Order that the District maintain Student's placement at Transcend and Fusion up until Student graduates;

11.  An Order that Student's Transition Plan be updated to reflect her current placement and further developed to provide Student with what is necessary for her to meet her stated transition goals;

12.  An Order that the District provide compensatory education as deemed appropriate by the presiding hearing officer;

13.  Parents preserve their right to seek attorney fees and costs incurred in litigating this due process hearing and obtaining the equitable relief and all other relief they are entitled to;

14.  That the District be required to provide training through OSPI to all District staff for every violation of IDEA identified by the presiding hearing officer;

15.  An Order that includes whatever additional relief the court may find just and equitable.

## <u>FINDINGS OF FACT</u>

In making these Findings of Fact, the logical consistency, persuasiveness and plausibility of the evidence has been considered and weighed. To the extent a Finding of Fact adopts one version of a matter on which the evidence is in conflict, the evidence adopted has been determined more credible than the conflicting evidence. A more detailed analysis of credibility and weight of the evidence may be discussed regarding specific facts at issue.

### Background

1.   The Adult Student was diagnosed with depression and anxiety around the age of eleven. P55p1.[5] She began experiencing suicidal ideations around the same age. *Id.* The Adult Student attempted suicide at age 11 and again at age 13. T405; T575-76.[6]

---

[5] Citation to the exhibits of record is by exhibit number and page number, e.g. P55p1 is a citation to Parents exhibit 55 at page 1.

[6] Citation to the transcript is by the letter "T" followed by the transcript page number.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0047
Docket No. 03-2023-OSPI-01824
8612 - OSPI
Page 4

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

2.      The Adult Student began receiving private psychiatric and psychotherapeutic care from Dr. John Pastor[7] in 2015.  P54p2; P55p1.  Dr. Pastor provided regular treatment for the Adult Student until February 2022.  *Id.*  Dr. Pastor also provided consultation to the Parents to provide them with strategies to help with the Adult Student's mental health challenges.  T42; T350-51.

3.      The Adult Student qualified for a 504 Plan at the beginning of the 2017-2018 school year when she was in 8th grade in the District.  D1p2.  The Adult Student struggled with anxiety and depression and experienced suicidal ideations during this time.  P55p2.

4.      In December 2017, the Adult Student was withdrawn from the District by her Parents and placed in a wilderness therapy program followed by a residential treatment center for six months.  D1p2; P55p2; T576-77.  The Parents placed the Adult Student at a wilderness therapy program because the Adult Student had not attended school for a month due to her anxiety and depression and the Parents were not able to get her into any other type of therapy.  T527.  The wilderness therapy program was meant to stabilize the Adult Student so she could begin treatment in an intensive therapy setting.  T527.

5.      The Adult Student returned to school in the District for the 2018-2019 school year as a 9th grader.  D1p2; P55p2.  The Adult Student experienced anxiety and depression during this school year.  P55p2.

### 2019 – 2020 School Year

6.      The Adult Student's mental health impairments worsened during the 2019-2020 school year.  P55p2.  Her depression began increasing during the winter of the 2019-2020 school year and continued to increase after school closed in March 2020 due to the Covid-19 pandemic.  T356-57.

7.      In January and February 2020, the Parents met with the Guidance Team at Issaquah High School to discuss their concerns regarding the Adult Student's increased anxiety which was causing the Adult Student to avoid school and to become "overwhelmed with initiating and completing school tasks."  D1p2.  The Parents were providing significant daily support to the Adult Student at this time to allow her to receive passing grades.  *Id.*

---

[7] Dr. Pastor received his bachelor's degree, master's degree, and doctorate degree from Louisiana State University.  P54Ap2.  He has worked in private practice doing child, adolescent, and adult psychiatry since 2003.  *Id.*

8.      The Adult Student had 20 excused absences and 22 tardies for the 2019-2020 school year.  P38p3.

### 2020 – 2021 School Year

9.      During the 2020 – 2021 school year, the Adult Student had a partial school schedule that included taking college level classes through the Running Start program at a local community college.  T361.  The Adult Student tried the Running Start program as an attempt to reduce her academic schedule and, in turn, lessen her anxiety around school.  T267; D1p2.

10.      The Running Start classes were asynchronous, so the Adult Student did not meet often with her teacher and was expected to do assignments on her own.  T361. The Adult Student was not able to successfully complete the courses and received no credit.  T361; P43p3-4.

11.      During the 2020 – 2021 school year, the Adult Student also took an Algebra 2 course.  In January 2021 she earned a D+ grade.  P43p3-4.  In June 2021, she earned no credit for the course.  *Id.*  In June 2021, she received a passing grade for her Guided Studies class, a Satisfactory grade for her Math TA class, and no credit for her Ceramics class.  *Id.*

12.      On March 1, 2021, the Adult Student visited Dr. Pastor for treatment. P54Bp25.  Dr. Pastor noted in the visit detail notes that the Adult Student was diagnosed with recurrent major depressive disorder in partial remission; obsessive-compulsive disorder, unspecified type; social phobia, generalized; parent-child relational problem; and post-traumatic stress disorder-rule out.[8]  *Id.*  The Adult Student's diagnoses remained the same throughout Dr. Pastor's visit notes through June 7, 2022.  P54Bp17.

### Initial Evaluation

13.      On March 8, 2021, when the Adult Student was in 11th grade, the Mother asked the District to evaluate the Student for special education eligibility.  D1p2.  The referral form indicated the areas of concern were behavioral and social/emotional, and indicated that the Adult Student's "level of engagement, motivation and grades have significantly declined this year despite moving to a partial schedule and having support from a 504 Accommodation plan."  *Id.*

---

[8] A "rule out" diagnosis is one that is being considered for the patient.  T105.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0047
Docket No. 03-2023-OSPI-01824
8612 - OSPI
Page 6

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

14.    On March 10, 2021, a guidance team meeting was held to discuss the Adult Student.  D2p1.  In attendance were the Parents; Melinda Mechler,[9] school psychologist; Holly Hovey, special education teacher; Christian McKone,[10] school counselor; Doug Wolff, assistant principal; Dr. Pastor, psychiatrist; and Kelly Tarp, general education teacher.  *Id.*  The team unanimously agreed to refer the Adult Student for a special education evaluation.  *Id.*

15.    On March 10, 2021, Ms. Mechler issued a prior written notice (PWN) proposing the Adult Student be evaluated for special education.  D2p1.  A consent form signed by the Mother was attached to the PWN.  D2p3-4.  The proposed areas for evaluation were: reading, behavioral, math, health and development, vocational and transition, written language, and social/emotional.  *Id.*  It also noted a general education observation would be done.  *Id.*

16.    On April 21, 2021, the Adult Student was evaluated for special education.  D3p6-27.  The Adult Student was found eligible for special education and determined to need specially designed instruction (SDI) in the area of social/emotional.  D3p18-19.  A PWN was issued the same date indicating the Adult Student was eligible for special education under the category of Other Health Impairment. D3p22.

### April 2021 IEP

17.    On April 21, 2021, the Adult Student's individualized education program (IEP) team met and developed the Adult Student's IEP.  D4p1-2.  In attendance at the meeting were the Parents, Kari Leon,[11] Ms. Tarp, Ms. Mechler, Ms. McKone, Mr. Wolff, and the Adult Student.  D4p1-2.

18.    The Adult Student's April 2021 IEP included an individualized transition plan to assist the Adult Student in her goal of attending college and gaining competitive employment in the field of psychology after graduating high school.  D4p7-8.  The IEP included the following goal: "By April 20, 2022, when given an assignment and due date, [the Adult Student] will create a task list, estimate the time needed to complete each task, initiate the tasks and complete in a pre-determined timeline as measured in 3 out of 4 instances during a 9 week period."  D4p13.

---

[9] Ms. Mechler has bachelor's degrees in Spanish and Portuguese, and a master's degree in educational psychology. T254. She is credentialed as a school psychologist.  She has been employed by the District for fifteen years. *Id.*

[10] Ms. McKone has a bachelor's degree in psychology and a master's degree in school counseling.  She worked as a school counselor in the District from 2018 – 2022.  T551.

[11] Ms. Leon has a bachelor's degree in learning disabilities and a master's degree.  T600.  She has been a certificated special education teacher in the District for 10 years.  T601; T612.

19.    The April 2021 IEP included one modification: "Option for Pass/Fail grading as determined by IEP Case Manager and General Education Teacher collaboration." D4p16.  It included the following accommodations:

> May turn in missing assignments up to 10 days prior to the end of the quarter with no grade penalty.
>
> Check ins-with an adult in the school when feeling anxious.
>
> May step out of the class for up to 5 minutes to help regulate when feeling anxious.
>
> Provide verbal encouragement for regular attendance and timely assignment completion.
>
> Access to class notes.
>
> Allow for online submission of homework assignments.
>
> With work completion, remind [Adult Student] to focus on effort versus the end result.
>
> Test individually or in a small group with separate testing location.
>
> Extended time on tests up to Double Time (all tests and quizzes)

D4p17.

20.    The April 21, 2021 IEP included 150 minutes of SDI in social emotional/behavioral weekly to be delivered in the general education setting by a general education teacher monitored by a special education teacher.  D4p19.

21.    On May 13, 2021, Ms. Leon issued a PWN related to a meeting that had been held to discuss the Adult Student's performance in Algebra 2 after special education services had been initiated. D5p1.  The Adult Student's IEP team decided to amend the IEP to include "modified assignments" as a modification.  *Id.*  The PWN indicated that the parents were trying to get the Adult Student to attend school in person, but she was not responsive.  *Id.*  The Student's IEP was amended on May 13, 2021, to include the following accommodation: "Modified assignments may be allowed as determined by IEP Case Manager and General Education Teacher collaboration." D6p3.

22.    On June 16, 2021, the Adult Student's progress on her IEP goal was measured. The progress update noted the Adult Student made "limited progress" and was able to initiate and complete the required task on 2 out of 4 opportunities.  D4p13.

23.    The Adult Student had 4 excused absences and 52.67 unexcused absences[12] during the 2020-2021 school year.  P38p6.

Summer 2021

24.    Ms. Leon issued a PWN dated June 3, 2021,[13] to memorialize the Adult Student's IEP team meeting held on June 2, 2021.  D7p1.  The team met again to check on the Adult Student's progress in her Algebra 2 class.  *Id.*  The PWN indicated the Student would receive 1:1 para educator support during summer school.  *Id.*  The team agreed to meet again before the end of the 2020-2021 school year.  *Id.*  The Parents had requested the Adult Student receive 1:1 teaching rather than 1:1 para support during summer school.  T630.

25.    On June 14, 2021, Ms. Leon emailed the Parents to provide information about the proposed 1:1 para support for the Adult Student during summer school.  P1p10. Ms. Leon stated that the para would attend class with the Adult Student and provide support "by helping during independent work periods to answer questions, get her started with initiation of tasks and work towards her Social-Emotional goal of creating a task list, estimating time to complete tasks and initiating and completing each task within the estimated time frame."  *Id.*  Ms. Leon also provided the Parents with a list of credits the Adult Student sill needed to accrue.  P1p11.  The Parents replied the same date and expressed concerns on how to broach the issue of para support with the Adult Student so that she did not have a bad reaction.  *Id.*

26.    On June 15, 2021, the Parents emailed the District indicating that they had concerns about the plan for the Adult Student to have para support over the summer. P1p8.  They were concerned that the para was only going to address executive functioning issues and not emotional issues.  *Id.*  The Parents suggested the para work with the Adult Student outside of the classroom rather than inside the classroom. P1p9.

27.    The Adult Student stopped regularly attending summer school after the first week and received no credit for the courses she took over the summer of 2021. D43p3-4; D8p1.

28.    During the Summer of 2021 the Adult Student began using marijuana and drinking alcohol.  T363.

---

[12] The Parents had the understanding that the Adult Student needed at least 10 unexcused absences before the District would offer further supports, so at some point they stopped excusing her absences from school.  T424.

[13] While the PWN is dated June 3, 2021, it discusses events that took place on June 8, 2021, indicating that it was actually issued on or after June 8, 2021.

**2021 – 2022 School Year**

29.    The 2021 – 2022 school year was the Adult Student's senior year of high school. T364; T717.

30.    During the late summer or early fall of 2021, Dr. Pastor determined that post traumatic stress disorder (PTSD) was the Adult Student's primary diagnosis. T106. Dr. Pastor's notes continued to list PTSD as a rule out diagnosis after this time because diagnostic information automatically carries over in the visit notes unless they are manually changed. T107-08. Dr. Pastor did not manually update his notes to indicate that PTSD was no longer a rule out diagnosis. T102-03.

31.    On August 5, 2021, the Parents emailed the District requesting an IEP team meeting to discuss what didn't work for the Adult Student during the summer. P1p3. They stated the Adult Student was still struggling academically and emotionally and stated it would be the last attempt to work with the District to try and find a program to meet the Adult Student's needs. P1p3.

32.    In August 2021, the Parents began speaking with Dr. Pastor about whether the Adult Student may need placement at a residential program to access her education. P54p3; P54Bp28. Dr. Pastor believed that even 1:1 instruction in all classes might not be appropriate for the Adult Student due to her significant impairments, and residential placement could be necessary. P54p4.    Dr. Pastor was concerned about the Adult Student's worsening ability to engage with her academics and her increasing avoidant and risk-taking behaviors. T45.

33.    A PWN was issued on September 1, 2021. D8p1. It indicated that the Parents were requesting the Adult Student work in a 1:1 setting with a teacher for the 2021-2022 school year. *Id.* The District refused the request because the Adult Student's "difficulty seems to be associated with the overall workload, not with the setting." *Id.* The PWN also indicated that the Adult Student attended summer school regularly for the first week with a 1:1 para educator, but that she had difficulty attending regularly after the first week. *Id.* The Adult Student reported the 1:1 para educator helped her gain a better understanding of the material because she could work at her own pace, and that she becomes overwhelmed and anxious if she feels she is falling behind. *Id.*

34.    On September 1, 2021, Ms. Leon emailed the Parents and Adult Student to provide options for spaces the Adult Student could go to during the day if she needed a quiet space. D29p1. She suggested the Adult Student go to the counseling center, student support center, or a staff member's office. *Id.* She also told the Adult Student to let her know if there was a different location that she preferred. *Id.*

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0047
Docket No. 03-2023-OSPI-01824
8612 - OSPI
Page 10

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

35.    On September 1, 2021, the Adult Student emailed Erin Connolly[14] to discuss her schedule.  P3p1.  Ms. Connolly responded that the Adult Student could come to Ms. Connolly's office the next morning.  Id.  The Adult Student did not show up to Ms. Connolly's office on September 2, 2021, as planned, and she did not attend school that morning.  P3p4.  Ms. Connolly sent the Adult Student an email on September 9, 2021, checking in since she had sent passes for the Adult Student to come to her office, but the Adult Student had not been at school.  On September 13, 2021, the Adult Student emailed Ms. Connolly apologizing for her absences and stating that things had been "extremely challenging" and she hoped to be at school the following day.  P3p6.  The Adult Student emailed Ms. Connolly again on September 13, 2021, reporting that she was able to make it to school that day.  Id.

36.    On September 8, 2021, Tammy Unruh[15] emailed Joan Lawson[16] and Ms. Carver stating that she anticipated the Parents and Adult Student would be seeking an outside placement during the next IEP team meeting.  P4p1.  She requested to talk internally prior to the meeting so she could be "fully prepared to make a decision."  Id.

37.    On September 9, 2021, the Father emailed the District stating that the Adult Student missed six of the last eight school days due to school refusal.  P5p1.  He stated they were lucky to get the Adult Student to school that day and the Parents were making every effort to support the Adult Student in getting to school.  Id.  Ms. Leon replied thanking the Father for the update and telling him to let her know if there was anything she could do to help get the adult Student to school, such as meeting her at the main entrance at the start of school.  P5p2.

38.    On September 13, 2021, Ms. Unruh emailed Dorothy Bearson[17] at Brooks Powers Group and stated she wanted to consult with Ms. Bearson regarding the Adult Student.  P4p6.  The District involves Ms. Bearson in cases with more extreme attendance issues.  T290; T300; T691.  Ms. Bearson helps to support teachers and

---

[14] Ms. Connolly has a bachelor's degree in history education and master's degrees in curriculum instruction and educational leadership.  T306-07.  She has worked for the District since 2010 and is currently the principal at Issaquah High School.  Id.

[15] Ms. Unruh has a bachelor's degree in secondary science education and a master's degree in educational administration.  T749.  She previously worked as a high school science teacher, assistant principal, and principal. T750.  For the past three years she has been employed as the Director of Secondary Special Services in the District. Id.

[16] Ms. Lawson has a bachelor's degree in K-8 education with a minor in special education and a master's degree in education.  She is the Special Services Director of District Programs.  T482.  Her primary duty is working with families who are placed in outside placements at nonpublic agencies.  T483.

[17] Ms. Bearson has a bachelor's degree in elementary education and an educational specialist degree in school psychology.  T668.  She is a licensed mental health counselor in Washington state and is currently working as a therapist and reengagement specialist with Brooks Powers Group.  Id.

other school staff when they create plans and collaborate with families to support students with their engagement in school.  T670.

39.    On September 14, 2021, Ms. Mechler had a phone conversation with Dr. Pastor about the Adult Student.  P54Cp5-6.  Dr. Pastor told her that the Adult Student's difficulties stem from anxiety, shame avoidance, and perfectionist tendencies.  *Id.*  Dr. Pastor stated that he did not know if 1:1 instruction would be sufficient for the Adult Student and stated that residential placement might be necessary.  P54p4-5; P54Cp6; T51.

40.    On September 15, 2021, the Father emailed the Adult Student's IEP team to report that the Adult Student was struggling and was not going to make it to school. P5p4.

41.    On September 15, 2021, Ms. McKone emailed Ms. Unruh and stated that the "communication was 10+ unexcused absences before Brooks Powers."  P6p1.

42.    On September 16, 2021, Ms. McKone emailed District teacher Anne Heller and stated that the Adult Student would be joining Ms. Heller's class as a tutor.  P7p1.  Ms. McKone stated that the adult Student is "SO sweet, but very fragile and tends to be absent a lot."  *Id.*

43.    On September 17, 2021, the Father emailed the District to report that while the Adult Student made it to most of her classes the day before, she spent time in Ms. McKone's office and the main office due to her anxiety.  P5p5.  He also reported that the Adult Student was struggling and would not make it to school that day.  *Id.*

44.    On September 17, 2021, Ms. Mechler issued a PWN.  D9p1.  It stated that an IEP meeting was held on September 15, 2021, to discuss the Parents' request for a District funded placement at a residential treatment center or a 1:1 setting for the Adult Student during the 2021-2022 school year.  *Id.*  The Parents' request was based on the Adult Student's school refusal.  The District rejected the request determining that it did not have data to support changing the Adult Student's placement to such a restrictive setting and that it would interfere with the Adult Student's post-secondary goals.  *Id.*  The District proposed conducting a functional behavioral assessment (FBA) and involving school refusal expert, Dorothy Bearson.  *Id.*  The IEP team agreed to reconvene on September 29, 2021, to discuss a private evaluation report related to the Adult Student that was expected to be completed on September 25, 2021.  *Id.*

45.     On September 17, 2021, the Parents emailed several District employees including Ms. Unruh.  D30p1.  They indicated their agreement with the District's proposal to further evaluate the Adult Student, but they requested the District use Dr. Lionel Enns instead of Brooks Powers.  *Id.*  Ms. Unruh replied to the email on the same date indicating there may be some confusion about the District's proposed next steps.  *Id.*  She stated that the District proposed an FBA for the Adult Student that would be done by Ms. Mechler, not Brooks Powers.  She also stated they wanted to engage Dorothy Bearson, a school refusal expert, to help design a program for the Adult Student.  Ms. Bearson would not be doing an evaluation.  *Id.*  She stated the District was not pursuing an outside evaluation at this time, but if the Parents were aware of another school refusal expert that could help the Adult Student, they would consider looking into working with that person.  *Id.*

46.     On September 20 and 21, 2021, the Parents emailed the District to report that despite the Parent's attempts, the Adult Student could not make it to school.  P5p6.

47.     On September 22, 2021, the Parents consented to the Adult Student undergoing an FBA.  D11.

**Dr. Fay IEE**

48.     On September 25, 2021, Gayle Fay, Ph. D.,[18] completed a neuropsychological evaluation of the Adult Student.  P9.  Dr. Fay performed a battery of tests over five dates but did not request any school records or input from school district staff or personnel.  P9p4; T203-04.  Dr. Fay diagnosed the Adult Student with attention deficit disorder – severe, dysthymia (generalized, chronic depressive disorder), generalized anxiety disorder, social anxiety disorder, and disruptive mood dysregulation disorder.  P9p18.  Dr. Fay found that the Adult Student "demonstrated impressive levels of capability in verbal and perceptual intellectual skills" and, if given extra time, the Adult Student was "superior in reading comprehension, computation, and written language."  P9p17.  She also found the Adult Student had "superior visual spatial adaptive problem-solving skills." *Id.*

49.     Further, Dr. Fay found that the Adult Student has a "significant constellation of deficits which will necessitate 1:1 intervention as well as accommodations in educational environments."  P9p17.  She noted the Adult Student "has reduced motor and information processing speed" that is "amplified by her severe Attention Deficit Disorder." *Id.*  Dr. Fay stated that the Adult Student "is hypervigilant to error, and this

---

[18] Dr. Fay received a bachelor's degree, a master's degree, and her doctorate from the University of Washington. P56p1.  She is a neuropsychologist and has served as the Director of the Northwest Neuropsychology Learning and Behavior Services since 1991.  P56p2; T111.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0047
Docket No. 03-2023-OSPI-01824
8612 - OSPI
Page 13

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

triggers pervasive performance anxiety as well as expectations to be unsuccessful in the educational setting." *Id.* Dr. Fay attributed some of the Adult Student's poor test results on her slow information processing. T140. She noted that the Adult Student loses focus due to attention issues and that maintaining attention across a whole series of auditory tasks can be very difficult for her. T141. Dr. Fay went on to state that "[c]onsideration of placement in a specialty school is strongly recommended given [the Adult Student's] high school history of lack of success in a traditional educational setting." P9p18.

50.    Dr. Fay found that the Adult Student's attention issues and slow speed of processing would put her at a "tremendous disadvantage in a larger classroom setting." T144. She noted that instructional formats with lecture or longer instructional presentation would be particularly difficult for the Adult Student. T144.

51.    The Parents paid $2,450.00 to Dr. Fay for the evaluation of the Adult Student. P51; T622.

52.    On October 5, 2021, the Parents emailed the District a copy of the neuropsychological evaluation Dr. Fay performed on the Adult Student. P9.

### October 2021 IEP Team Meeting

53.    On October 4, 2021, District staff member Bridget Johns emailed Ms. McKone asking if she had heard from the Adult Student, who had been frequently absent. P6p4. Ms. McKone replied that she had not heard from the Adult Student but had reached out several times. P6p3.

54.    On October 5, 2021, Annie Heller, teacher at the District, emailed Ms. McKone asking about the Adult Student. P6p5. She reported that the Adult Student had yet to attend her class and she would have to give her a grade of zero. *Id.* Ms. McKone replied that "[t]his has been an ongoing struggle." *Id.*

55.    On October 7, 2021, the Adult Student's IEP team met. P11p3. Dr. Fay attended the meeting to discuss her evaluation of the Adult Student. *Id.* Dr. Fay told the team that the appropriate educational environment for the Adult Student would be a full time 1:1 setting at Brightmont or Dartmoor. P11p5; T179, 191. Dr. Fay noted that "a regular classroom will put [the Adult Student] behind very quickly." P54Cp2. Ms. Unruh proposed that the Student start with one class at Brightmont or Dartmoor to see if that works for the Adult Student and continue to be enrolled in Issaquah High School for the rest of her classes. *Id.* The District did not feel they had the necessary data showing that 1:1 instruction would work for the Adult Student. T765.

56.    On October 8, 2021, Ms. Unruh emailed Katheryn Nantz, a District Board Certified Behavioral Analyst, to provide expertise related to the Adult Student.  P6p13.

57.    Ms. Mechler and Ms. Unruh were aware that the Parents wanted a full-time 1:1 academic placement for the Adult Student during the 2021-2022 school year.  T301; T765.

58.    Ms. Leon issued another PWN on October 11, 2021, stating the District would fund one 1:1 class at Dartmoor School or Brightmont Academy to determine whether 1:1 instruction would be the best option for the Adult Student.  D13p1.  It also stated Mr. McKone would connect the family with Ms. Bearson who would work with them directly on school reengagement.  *Id.*

59.    Ms. Bearson met with the Parents approximately eight or nine times and met individually with the Adult Student approximately four to five times.  T675-76.  Ms. Bearson did not serve as a therapist for the Adult Student or the Parents.  T681.

60.    On October 15, 2021, the Parents emailed the IEP team to inform them that they concluded Brightmont would be a better placement for the Adult Student than Dartmoor and asked the District to reach out to them to arrange for enrollment. P12p1.

61.    On October 19, 2021, Ms. Heller again emailed Ms. McKone stating that the Adult Student had yet to attend her class and she wasn't sure how to proceed regarding grades.  P6p20.

**Functional Behavior Assessment (FBA) and Behavior Intervention Plan (BIP)**

62.    An FBA of the Adult Student was completed on November 9, 2021.  D14p5. The FBA found that "when [the Adult Student] faces social and academic demands of school she avoids attending school to avoid situations that produce feelings of stress, shame and performance anxiety."  D14p8.  It noted that she was absent 54 days in the 11th grade.  *Id.*  It stated that during the current school year, her 12th grade year, out of 46 school days, she had attended three full days and 4 partial days.  *Id.*   The FBA identified the Adult Student's antecedent behaviors as the following:

> [Adult Student] is at home and feeling anxious about going to school or engaging in school work.  This includes aspects of the morning routine that might lead [Adult Student] to feel self-conscious or worry about her impact on her peers
>
> When feels she [is] not perfect at something. Most often this feeling can be felt when asked to complete a writing task.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0047
Docket No. 03-2023-OSPI-01824
8612 - OSPI
Page 15

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

Prior to a test or exam.

When misses school; begins to feel behind and won't be able to catch up – shuts down

[Adult Student] reports it is hard to get up and go to school – "feels better once at school."

D14p8. The FBA indicated that the Adult Student "will learn coping strategies for managing the feelings that lead to shutting down," and "will engage in helpful communication skills when feelings that lead to shut down behavior are present." D14p10.

63. A Behavior Intervention Plan (BIP) was developed for the Adult Student in November 2021. D15. The BIP indicated the following antecedent strategies:

[The Adult Student] will be given advance notice prior to writing tasks, given a breakdown of the steps needed to complete it and a timeline of completion as well as multiple options for how best to complete the task. This executive functioning support will also include visuals that help direct [the Adult Student] to a manageable next step while also reminding her of her options to communicate breaks, when needed.

[The Adult Student] will be given support to identify the helpful versus unhelpful thoughts associated with predicted negative social outcomes. In addition, when perceived negative social interactions are identified, [the Adult Student] will be given a script to help replace unhelpful thoughts and identify helpful ones in the moment based on replacement behaviors that support academic engagement.

D15p2. The BIP indicated the following responses to target behaviors:

[The Adult Student] will engage in a gradual introduction of stressors based on steps identified by [the Adult Student] as [a] hierarchy of negative feeling invoking actions. For example, this might look like gradually engaging in a class without a preferred peer, or sitting with the worry of inconveniencing someone for a small manageable time period that gradually increases with a decrease in negative feelings. This will take place with direct coaching on coping strategies, methods for communicating current feelings and needs and the ability to take breaks in a structured and supportive way.

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0047
Docket No. 03-2023-OSPI-01824
8612 - OSPI
Page 16

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

Parent coaching in how to block avoidance and maintain contingencies outlined in the gradual introduction of stressor plan.  Teacher coaching in how to respond to avoidance or escape behavior with boundaries and validation.

*Id.*

64.     The Adult Student turned 18 years old in December 2021.  P29p2.

**Brightmont Academy**

65.     On December 6, 2021, the Adult Student began taking one class at Brightmont Academy.  P15p1.  Brightmont Academy provided instruction in a 1:1 setting for the Adult Student.  T366.

66.     On December 7, 2021, the registrar for Issaquah High School emailed other District staff, including Ms. McKone, and stated that the Adult Student had missed more than 20 days of school in a row.  P14p6.

67.     On December 7, 2021, Ms. Leon emailed the Parents a PWN indicating that the Adult Student was not on track to graduate in June 2022.  D16.  Ms. Leon indicated that she did not believe it was necessary to share the information with the Adult Student at this time because the Adult Student was currently working on an intervention plan developed by the IEP team.  D16p1.

68.     On December 9, 2021, the Parents emailed the District to update them on the Adult Student's status.  P15p1.  They reported that she was attending Brightmont and felt comfortable in the environment.  However, they also reported that her mental health was deteriorating and that her anxiety and depression were increasing.  *Id.*  They reported that the Adult Student was experiencing suicidal ideations.  *Id.*  They stated that the longer the Student was out of school, the worse her mental health deteriorated.  *Id.*  Ms. Unruh replied to the Parents on the same day thanking them for the update and suggesting the IEP team schedule a check-in for mid to late January to review the Adult Student's progress and decide on next steps.  *Id.*

69.     On December 16, 2021, Brightmont Academy emailed Ms. McKone to report that the Adult Student had attended every class since her enrollment started.  P14p9.

70.     On January 8, 2022, Ms. Leon emailed Brightmont Academy to get a progress update for the Adult Student.  D31p5.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0047
Docket No. 03-2023-OSPI-01824
8612 - OSPI
Page 17

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

71.    On January 10, 2022, Tony Beals from Brightmont Academy emailed Ms. Leon and stated that the Adult Student's attendance had been "very good so far." D31p4. He stated that her current grade was an A- or 90%. *Id.*

72.    The Adult Student felt successful at Brightmont but her inability to attend her classes at Issaquah High School made her feel like she was failing. T368.

73.    On January 26, 2022, Mr. Beals emailed the District to report that the Adult Student has missed her last four class sessions. D31p4.

74.    On January 27, 2022, Ms. Leon emailed the Parents and Adult Student to check in and see how things were going at Brightmont and check-in on the Adult Student's recent absences. D31p3.

75.    On January 27, 2022, Ms. Bearson emailed Ms. Unruh to report that she was working with the Parents and Adult Student to come up with a plan to help get the Adult Student back into school, and she hoped the plan would be finalized that day. P16p12.

76.    On January 31, 2022, Ms. Leon emailed Brightmont Academy to check on the Adult Student's attendance. P16p13. Brightmont Academy responded that they had not spoken directly to the family but did receive an email stating the Adult Student was feeling very depressed lately. *Id.*

77.    On February 8, 2022, the Adult Student's goal progress update noted that the Adult Student had made no progress on her IEP goal. D4p13.

78.    On February 15, 2022, Ms. Johns emailed other District staff to check on the Adult Student, noting that the Adult Student had not attended class all year. P16p14. Ms. McKone and Ms. Leon replied confirming that the Adult Student had not attended the high school during the entire school year and the Adult Student had recently stopped attending Brightmont Academy as well. *Id.*

79.    The Adult Student failed all classes she was enrolled in at Issaquah High School for the 2021 – 2022 school year. D43p3-4.

**The Meadows**

80.    In early February 2022, the Adult Student and her Parents attended a three-day intensive family therapy weekend in Utah. T530.

81.    The Father emailed the District on February 18, 2022, in response to Ms. Leon's email checking on the Adult Student's recent absences. D31p2. The Father indicated a lot had changed for the Adult Student since December. *Id.* He stated:

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0047
Docket No. 03-2023-OSPI-01824
8612 - OSPI
Page 18

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

- Re: Brightmont, [the Adult Student] began the year making it to classes the first 2 weeks (5 of 6). A number were via video as [the Adult Student] was unable to make it there in person. [The Adult Student] has not attended classes at Brightmont since attending the 1.13.22 class.

- [The Adult Student] continues to struggle with her mental health. The holidays were tough for [the Adult Student], and our family. We were hopeful at the beginning of the year based on her attendance that [the Adult Student] was turning the corner. Unfortunately, due to her daily internal fight, [the Adult Student] stopped attending classes and fell behind, which led to a significant increase in her feelings of shame. These feelings continue to dominate much of her thought process.

- [The Adult Student,] unfortunately, started cutting again, which is tough to see as it is a sign of her constant struggle with her depression and anxiety. She fights every day with this.

- [The Adult Student's] employer asked that she take a break from her position to focus on her mental health. They are very supportive and understand the importance of getting in front of her depression and anxiety. They did reach out regarding the spring schedule, which starts mid-March. No date has been set for returning.

- [The Adult Student] is seeing a therapist weekly, outside of Dorothy. Dorothy has been flexible with trying to connect with [the Adult Student] but again, [the Adult Student's] shame and current state is impacting her, especially with the high level of shame.

- Due to the challenges that we believed were spiraling out of control, we identified a program focused on the family. [The Mother, Adult Student,] and I flew to Utah in early February for a 3 day family intensive. We worked closely with two therapists for 3 days (22 hours of therapy) to better understand the family dynamics and how we could best support [the Adult Student] in her journey to achieve success with her mental health, her academics and her path forward. We paid out of pocket (over $12k) for this Intensive as we felt we had no other options available to us. We are hopeful with the plan we discussed with the team in Utah but time (something we believe we don't have a lot of) will be the measure of its success.

*Id.* The Father also requested the Adult Student's IEP team meet to discuss recommendations on how to help the Adult Student. *Id.*

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0047
Docket No. 03-2023-OSPI-01824
8612 - OSPI
Page 19

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

82.    In February 2022, the Adult Student began feeling overwhelmed and increased her alcohol consumption significantly.  T370-71; T539.  This culminated in the Adult Student attempting to commit suicide.  T371.

83.    On February 22, 2022, the Parents emailed Ms. Unruh and Assistant Superintendent Dana Bailey indicating they intended to place the Adult Student at a residential treatment center, and they would be requesting reimbursement from the District.  P17p1-2.  In the letter, the Parents stated that the Adult Student made an attempt on her life on February 21, 2022, and she was admitted to inpatient care at Overlake Hospital.  P17p2.  The Adult Student would remain at Overlake Hospital for three to five days.  *Id.*

84.    On February 23, 2022, the Parents emailed Evoke Therapy Programs to seek advice on a future therapeutic placement for the Adult Student.  P18p4.

85.    After being released from Overlake Hospital, the Adult Student returned to her home.  T371.

86.    The Parents reached out to The Meadows on February 25, 2022, regarding enrolling the Adult Student in their program.  P19p3.  The Meadows is a 45-day in-patient program for young adults struggling with addiction, emotional trauma, and mental health issues.  D17p1.  The Adult Student reported that she wanted to enroll starting March 14, 2022.  P19p1.

87.    On February 28, 2022, Ms. Unruh emailed the Father asking for the name of the place the family went to over winter break for family intensive therapy and requested any discharge instructions.  D31p2.  She also stated that Ms. Leon was in the process of scheduling a meeting.  *Id.*

88.    On March 3, 2022, the Father emailed the District stating that the family had attended Evoke Therapy on February 4 – 6 for a three-day family intensive.  D31p1.  On March 9, 2022, the Father emailed the District summaries put together by the therapists at Evoke for the family.  *Id.*  A therapist from Evoke issued recommendations for the family which were to seek family therapy; continue with individual therapy; continue family of origin work; continue with boundary work; and seek support from Evoke as needed.  D31p7.

89.    On March 11, 2022, a PWN was issued to memorialize an IEP team meeting held on March 9, 2022.  D17p1.  The PWN indicated the meeting was held to discuss the Parents' request for a District funded placement at an out-of-state in-patient treatment center.  *Id.*  The school members of the team proposed initiating a reevaluation before determining whether to change the Adult Student's placement.  *Id.*  The PWN also stated that the Parents intended to place the Adult Student at The

Meadows on March 14, 2022. The Parents requested the District fund this placement, and that request was denied. *Id.*

90.    On March 11, 2022, The Meadows emailed Ms. Unruh and stated that the program the Adult Student was going to be attending did not offer special education staff. D33p1; T462.

91.    The Adult Student started at The Meadows on March 14, 2022. P25p2. She attended the section of The Meadows called the Claudia Black Young Adult Center, which is geared toward adults aged 18 - 26. T372; T458. The purpose of the program is to provide safety and stabilization to patients and allow them to get their symptoms under control so they can work on healing the underlying causes of their issues. T461; T463; T465. The Meadows does not provide any academic instruction. T462.

92.    The Parents believed The Meadows was appropriate for the Adult Student because they believed her mental health would not have allowed her to access any educational programming at that time. T418. They were not concerned about the lack of academics at The Meadows because the Adult Student had not been attending school for a significant time period before entering The Meadows. T541.

93.    The Meadows did a psychiatric evaluation of the Student on March 15, 2022. D28p1. The Adult Student was diagnosed with Post-Traumatic Stress Disorder, Chronic (Complex); Alcohol Use Disorder, Mild to Moderate; Unspecified Cannabis Use Disorder; Generalized Anxiety Disorder with Panic Attacks; Attention Deficit Hyperactivity Disorder, Predominantly Inattentive Type; and Major Depressive Disorder, Recurrent, In Full Remission. D28p4. Substance abuse was not the primary focus of the Adult Student's treatment at The Meadows. T94.

94.    The Parents paid $64,820 for the Adult Student to attend The Meadows. T624.

### April 2022 Reevaluation and IEP

95.    On March 14, 2022, Ms. Mechler sent the Parents an evaluation consent form for the Adult Student and a parent questionnaire and health update form to be completed. D32p1-2. On March 16, 2022, the Father replied to Ms. Mechler and returned the signed consent form. D32p1. The Father emailed the completed Parent Questionnaire on March 23, 2022. *Id.*

96.    As of April 8, 2022, the Adult Student had had 74.62 unexcused absences and .14 excused absences during the 2021-2022 school year. P38p9.

97.    On April 14, 2022, John Meissbach from The Meadows emailed the Parents stating that the clinical team at The Meadows recommended Extended Care

Residential level for the Adult Student after her release from The Meadows.  P33p15. Mr. Meissbach recommended the following facilities: Rising Roads Recovery, Peaks Recovery, and Transcend.  *Id.*

98.    On April 21, 2022, the District completed a reevaluation of the Adult Student, which included assessments in the following areas: behavioral, health and development, vocational and transition, and social/emotional.  D18p10.  The reevaluation found the Adult Student eligible for special education and requiring SDI in social/emotional and behavior.  D18p22.  The reevaluation noted the Adult Student's impairments caused "limited stamina and motivation for attending school and managing school-related tasks."  D18p26.

99.    A new IEP was developed for the Adult Student dated April 21, 2022.  D19; P29. The District issued a PWN on April 22, 2022.  P29p2.  The PWN stated that the IEP team agreed to place the Adult Student at a residential school that had both an educational component and therapeutic support.  *Id.*  The IEP called for 60 minutes weekly of behavior SDI and 60 minutes weekly of social/emotional SDI.  P29p7.

100.    On April 25, 2022, Ms. Lawson began working with the Parents and Adult Student to find an appropriate outside placement for the Adult Student.  T489. Because the Adult Student was 18 years old, it was difficult to find a residential placement that would accept her and provide educational services.  T491.  The Parents worked collaboratively with Ms. Lawson to find the Adult Student's placement.  T492; T543.

101.    There was a space available for the Adult Student at the private school Rising Roads on April 29, 2022.  T620.  However, the District did not agree to place the Student at that school because there was no educational component.  T496; T593.

102.    Upon discharge from The Meadows, the Adult Student went to California to stay with friends.  T374-75.  After a few weeks, she returned to Washington state and stayed with a friend of her Mother who lived in the same neighborhood as the Parents. T376, 396.

### Transcend / Fusion Academy

103.    On June 15, 2022, the IEP team agreed to place the Student at Transcend for the therapeutic portion of the placement and to look for another program to provide the educational component of the Adult Student's placement.  P29p2.  The IEP team discussed allowing the Adult Student some transition time to get used to Transcend before starting academic classes.  T523.

104.    Because Transend was not a nonpublic agency school, the District had to write a letter of justification to the Office of Superintendent of Public Instruction to get approval for such a placement.  T491.

105.    The Adult Student began her placement at Transend on June 25, 2022.  D26p1. She remained there through July 2023.  D26p16.  Transend was a therapeutic program that did not include an educational component.  T376, 378.  At the time the Adult Student was placed at Transend, the team had not found an educational program for the Adult Student to attend.  T498-99.

106.    The Adult Student's counselors at Transend provided the SDI indicated in her April 2022 IEP.  T503.  The Adult Student's programming at Transend started with eight hours a day of therapy, and the amount of daily therapy decreased over time.  T647.

107.    The District issued a PWN on August 18, 2022.  D21.  It stated the Student had been in Transcend for approximately one month and was ready to begin taking classes at Fusion Academy.  *Id.*  The IEP team agreed to reconvene on August 26, 2022, with the Adult Student in attendance to finalize her class schedule.  *Id.*

108.    The Adult Student received 1:1 instruction through Fusion Academy starting in mid-September 2022.  P55p5; T379; T513.

109.    The District paid for the Adult Student's placement at Transend and Fusion. T518-19.  It also paid for the Parents and the Adult Student's brother to visit the Adult Student at Transend as part of family therapy.  T730.  The District paid $39,500 per month for the Adult Student to attend Transend.  D26.

110.    On February 16, 2023, the District issued a PWN indicating an amendment was made to the Adult Student's IEP.  D22.  The Adult Student's IEP was changed to update two goals and to amend the least restrictive environment to Non-Public Agency. D22p1.

111.    The Adult Student's IEP team developed a new IEP for the Adult Student dated April 20, 2023.  P44.  On April 26, 2023, a PWN was issued by the District.  D23p2.  It stated that additional changes and corrections were made to the Adult Student's IEP including the removal of the BIP and an updated transition plan.  *Id.*  The team agreed to meet monthly with the Adult Student to discuss her programing and plan for graduation.  D23p3.

112.    On May 5, 2023, the District issued a PWN.  D20.  The PWN stated the Adult Student's IEP team met to discuss what she needed to do to graduate.  D20p1.  The IEP team agreed to waive three credits for the Adult Student.  *Id.*

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0047
Docket No. 03-2023-OSPI-01824
8612 - OSPI
Page 23

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

113.    The classes the Adult Student took at Fusion allowed her to earn her diploma from Issaquah High School.  T344-45.

114.    On September 8, 2023, Ms. Lawson sent an email to the Adult Student congratulating her on her graduation.  D24p1.  She also provided the Adult Student with documentation the Adult Student could use in college to request additional support, if needed.  *Id.*

115.    The Adult Student is currently living in California and doing very well.  T538; T343-44.  She works at Starbucks and is planning to start college in the coming year. T343-44; T400.

*Dr. John Pastor*

116.    Dr. Pastor opined that the Student's PTSD, ADHD, and cognitive processing issues "result in an unconscious, intense efforts to avoid feelings of inadequacy and shame."  P54p2.  He further opined that the Adult Student "set idealized and unhealthy expectations for herself, neglected and avoided the need for self-care and academic and psychosocial supports, and avoided, withdrew from or dissociated from tasks in which she felt inadequacy or shame, in particular academic work or instruction."  *Id.* at 2-3.  The intensity of the Student's drive to avoid shame also impaired her ability to accept support.  T44.

117.    Dr. Pastor further opined that the Adult Student used marijuana and alcohol as a way to avoid the fear and shame that would build up based on her anxiety and avoidance behaviors.  T54-56; T390.

118.    Dr. Pastor opined that by January 2022, the Adult Student "was unable to engage in any formal education and required a residential program to stabilize her severely degraded sense of self and ability to function before reengaging in an academic setting of any kind."  P54p5.  Dr. Pastor reviewed The Meadows program and felt it was the appropriate place for the Adult Student to attend to treat and stabilize her mental health.  *Id.*  He did not believe the Adult Student could be successful in any academic setting at that point.  *Id.*  Dr. Pastor opined that forced academics at that point would have led to "additional academic failures, further psychological decline," and prolonged need for residential placement.  P54p5-6.  He also opined that "[g]iven Student's risks of avoidance, impulsivity, self-neglect, self harm, inappropriate seeking of peer connection," he thought the 24-hour monitoring and structure of The Meadows was appropriate.  T60-61.

119.    Once the Adult Student was released from The Meadows, Dr. Pastor continued to provide psychological consultation for the Adult Student for a brief time period.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0047
Docket No. 03-2023-OSPI-01824
8612 - OSPI
Page 24

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

P54p6.  At that time, it was Dr. Pastor's opinion that the Adult Student needed to be placed at a "structured residential program with an academic component." *Id.*

120.    Dr. Pastor's opinions are accorded significant weight.  He was the Adult Student's treating provider since 2015 and had frequent contact with the Adult Student and the Parents during the relevant time period.

<u>CONCLUSIONS OF LAW</u>

**Jurisdiction and Burden of Proof**

1.    The Office of Administrative Hearings (OAH) has jurisdiction over the parties and subject matter of this action for the Superintendent of Public Instruction as authorized by 20 United States Code (USC) §1400 *et seq.*, the Individuals with Disabilities Education Act (IDEA), Chapter 28A.155 Revised Code of Washington (RCW), Chapter 34.05 RCW, Chapter 34.12 RCW, and the regulations promulgated under these provisions, including 34 Code of Federal Regulations (CFR) Part 300, and Chapter 392-172A Washington Administrative Code (WAC).

2.    The burden of proof in an administrative hearing under the IDEA is on the party seeking relief. *Schaffer v. Weast*, 546 U.S. 49, 62 (2005). The Parents are seeking relief and bear the burden of proof in this case. The U.S. Supreme Court and Washington courts have generally held that the burden of proof in an administrative proceeding is a preponderance of the evidence. *Steadman v. SEC*, 450 U.S. 91, 102 (1981); *Thompson v. Dep't of Licensing*, 138 Wn.2d 783, 797 (1999); *Hardee v. Dep't of Social & Health Services*, 172 Wn.2d 1, 4 (2011*)*. Therefore, the Parents' burden of proof in this matter is preponderance of the evidence.

**The IDEA and FAPE**

3.    Under the IDEA, a school district must provide a free and appropriate public education (FAPE) to all eligible children. In doing so, a school district is not required to provide a "potential-maximizing" education, but rather a "basic floor of opportunity." *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 197 n.21, 200-201 (1982).

4.    In *Rowley*, the U.S. Supreme Court established both a procedural and a substantive test to evaluate a state's compliance with the IDEA. The first question is whether the state has complied with the procedures set forth in the IDEA. The second question is whether the individualized education program developed under these procedures is reasonably calculated to enable the child to receive educational benefits. "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Rowley*, 458 U.S. at 206-07.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0047
Docket No. 03-2023-OSPI-01824
8612 - OSPI
Page 25

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

5.      Procedural safeguards are essential under the IDEA, particularly those that protect the parent's right to be involved in the development of their child's educational plan. *Amanda J. v. Clark County Sch. Dist*., 267 F.3d 877, 882 (9th Cir. 2001). Procedural violations of the IDEA amount to a denial of FAPE and warrant a remedy only if they:

> (I) impeded the child's right to a free appropriate public education;

> (II) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a free appropriate public education to the parents' child; or

> (III) caused a deprivation of educational benefits.

20 USC §1415(f)(3)(E)(ii); WAC 392-172A-05105(2); 34 CFR §300.513(a)(2).

6.      "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas County Sch. Dist. RE-1*, 580 U.S. 386, 137 S. Ct. 988, 999, 197 L. Ed. 2d 335 (2017). The determination as to whether an IEP is reasonably calculated to offer a student FAPE is a fact-specific inquiry. As the U.S. Supreme Court has made clear, "[a] focus on the particular child is at the core of the IDEA," and an IEP must meet a child's unique needs. *Id.* The "essential function of an IEP is to set out a plan for pursuing academic and functional advancement." *Id.* Accordingly, an IEP team is charged with developing a comprehensive plan that is "tailored to the unique needs of a particular child." *Id*. at 1000. Additionally, the Student's "educational program must be appropriately ambitious in light of his circumstances . . . ." *Id.*

7.      In reviewing an IEP, "the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id*. at 999 (emphasis in original). The determination of reasonableness is made as of the time the IEP was developed. *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999). An IEP is "a snapshot, not a retrospective." *Id.*

**Whether during the 2021-2022 school year, until Student's private placement, the District violated IDEA and denied Student a FAPE by failing to provide her with an Individualized Education Program (IEP) that was reasonably calculated to meet her needs**

8.      Parents argue that the District failed to provide the Adult Student with FAPE during the 2021 – 2022 school year by failing to offer an IEP reasonably calculated to meet her needs.  Because of this, the Parents argue they are entitled to tuition reimbursement for the cost of the Adult Student's time at The Meadows.  In the

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0047
Docket No. 03-2023-OSPI-01824
8612 - OSPI
Page 26

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

alternative, the Parents argue that they are entitled to reimbursement of the cost of The Meadows as compensatory education.

*Tuition Reimbursement*

9.    Parents who unilaterally enroll a student in a private school are entitled to reimbursement only if: (1) the district placement violated the IDEA; and (2) the Parents' private school placement is "proper" under the IDEA. *Florence County Sch. Dist. v. Carter,* 510 U.S. 7, 15, 114 S. Ct. 361 (1993).

10.    In regard to the first prong of the test, the amended April 2021 IEP was in place for the Adult Student at the start of the 2021 – 2022 school year.  This IEP placed the Adult Student in the general education setting for 100% of the school day.  The Parents have not provided sufficient evidence to show that the IEP was inappropriate at the time it was developed.

11.    However, in October 2021, the District agreed to change the Adult Student's placement.  At that point, the Adult Student was exhibiting school refusal, and the Parents were requesting full time 1:1 instruction for the Adult Student.  The Adult Student had expressed to the IEP team that instruction in the 1:1 setting was a positive experience for her because she could work at her own pace.  The IEP team was informed by Dr. Pastor that the Adult Student was struggling, that even 1:1 instruction might not be enough, and that he feared the Adult Student might need residential placement.  The Parents provided the IEP team with Dr. Fay's private evaluation, which recommended the Adult Student receive 1:1 academic instruction.  Based on this, the District agreed to place the Adult Student at Brightmont, a 1:1 instructional setting, for one academic class with the remainder of her day spent in general education at Issaquah High School.  The District also proposed a FBA and BIP to address the school refusal behavior and engaged Ms. Bearson to work directly with the Adult Student and Parents.  While the Adult Student's IEP was not amended at this point, the District clearly changed the Adult Student's educational placement.

12.    All of the evidence being provided to the District was that the Adult Student needed 1:1 academic instruction to be successful.  Dr. Pastor and Dr. Fay both expressed to the IEP team that the Adult Student needed 1:1 instruction.  The Adult Student herself expressed that 1:1 instruction was the only time she felt academically successful.  In addition, the IEP team was well aware of the Adult Student's failing grades and significant school refusal behaviors related to attending Issaquah High School.  The hybrid placement of Brightmont and Issaquah High School was not appropriate for the Adult Student at the time it was presented in October 2021.  The Adult Student was unable to attend class at Issaquah High School, and despite some

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0047
Docket No. 03-2023-OSPI-01824
8612 - OSPI
Page 27

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

success initially at Brightmont, her inability to attend her other classes caused her mental health to deteriorate.

13.    The preponderance of the evidence supports a finding that the placement being offered by the District in October 2021 was not reasonably calculated to meet the Adult Student's needs and violated the IDEA.

14.    While the Parents have satisfied the first prong of the test for tuition reimbursement, the evidence does not support a finding that placement at The Meadows was proper.  Under the second prong, "[a] placement is proper if it is specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction." *Bellflower Unified Sch. Dist. v. Lua*, No., 2019 U.S. Dist. LEXIS 112829 *13 (C.D. Cal. July 8, 2019), aff'd 2020 U.S. App. LEXIS 33641 (9th Cir. 2020). Once a district fails to develop an IEP that makes FAPE available, the proper private placement need only confer some educational benefit to the student. *C.B. v. Special Sch. Dist. No. 1* 56 IDELR 187 (8th Cir. 2011); and *Warren G. v. Cumberland County Sch. Dist.* 31 IDELR 27 (3d Cir. 1999).  A private school placement does not need to maximize the student's potential or provide every special education service and support she needs to be deemed proper or "appropriate" for reimbursement purposes. *See, e.g., C.B. v. Garden Grove Unified Sch. Dist.*, 56 IDELR 21 (9th Cir. 2011), *cert. denied*, 111 LRP 68912, 132 S. Ct. 500 (U.S. 2011). Rather, to qualify for reimbursement, parents must "demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction. *Id.* at 1159 (quoting *Frank G. v. Bd. Of Educ. Of Hyde Park*, 459 F.3d 356, 365 (2d Cir. 2006).

15.    The Ninth Circuit has made clear that a residential placement is justified under the IDEA when it is "necessary for educational purposes," rather than as "a response to medical, social, or emotional problems ... quite apart from the learning process." *Ashland Sch. Dist. v. Parents of Student R.J.,* 588 F.3d 1004, 1010 (9th Cir. 2009) (*quoting Clovis Unified School Dist. v. California Office of Administrative Hearings,* 903 F.2d 635, 643 (9th Cir. 1990)).  In *Clovis*, the court determined, "Where, as here, a child requires six hours per day of intensive psychotherapy, such services would appear 'medical' in that they address a medical crisis."  903 F.2d 645.  Similarly, in *Ashland Sch. Dist. v Parents of Student E.H.,* 587 F.3d. 1175 (9th Cir. 2009), the court found the student's educational and medical issues were not intertwined.  In that case, the student had been hospitalized for threating to harm his family and was "in no condition to devote much time or effort to schoolwork" during the first six months he spent at the residential facility.  587 F.3d at 1185.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0047
Docket No. 03-2023-OSPI-01824
8612 - OSPI
Page 28

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

16.    In contrast, the Ninth Circuit found that a residential placement was appropriate in *County of San Diego v. Cal. Special Educ. Hearing Officer,* 93 F.3d 1458 (9th Cir. 1996).  In that case, the student was hospitalized for violent outbursts related to preparing a school science report and had been assigned little or no homework because it was regarded as too stressful for her. The court determined residential placement was necessary because the student's "primary problems" were "educationally related."  93 F.3d at 1468.

17.    Similarly, in a recent Ninth Circuit case, *Edmonds Sch. Dist. v. A.T.,* 780 Fed. Appx. 491 (9th Cir. 2019), the student at issue was placed in a private residential placement (Provo Canyon School) unilaterally by his parents. In the two years leading up to his placement at Provo, his grades dropped dramatically, and he committed more than twenty disciplinary offences.  Despite this, the school district did not reevaluate the student, change his IEP, or offer a residential placement.  The district argued that "truancy rendered him unable to take advantage of the offered educational opportunities, thereby excusing its failure to offer a reasonably calculated IEP."  780 Fed. Appx. at 494.  This argument was rejected by the ALJ, the district court and the Ninth Circuit.  The school district also challenged whether the placement was "proper," arguing the student's mental health had deteriorated so significantly that he "could only benefit from serious medical intervention, so any placement must be understood as a medical one."  The Ninth Circuit disagreed, stating, "Students who require residential placement to obtain an educational benefit are often experiencing some acute health crisis at the time they are placed – the severity of their condition is precisely why they need residential treatment. If we adopted the district's approach, it is difficult to imagine how any private residential placement would be reimbursable under the IDEA."  780 Fed. Appx. at 495.  Moreover, the court found that Provo was an educational, rather than medical, placement, because it is an accredited educational institution with a full day school and regular classroom settings, its instructors are employed by the facility, and most are certified special education teachers.

18.    Here, the Adult Student's placement at The Meadows was in response to an acute medical issue.  The Adult Student had recently attempted suicide and she was placed at The Meadows to stabilize her mental health.  While the Parents argue the placement at The Meadows was for educational purposes, it is uncontested that The Meadows does not offer an educational component.  The Meadows does not provide any educational services and does not have special education teachers on staff.  The Meadows is a 45-day treatment facility meant to help individuals struggling with addiction, emotional trauma, and mental health issues.  While placement at The Meadows may have been necessary for the Adult Student's mental health, it is not a proper educational placement for purposes of tuition reimbursement.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0047
Docket No. 03-2023-OSPI-01824
8612 - OSPI
Page 29

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

*Compensatory Education*

19.    The Parents also argue that they are entitled to reimbursement for The Meadows tuition as a form of compensatory education to make up for the FAPE denial during the 2021 - 2022 school year. As found above, the District did deny the Student FAPE by failing to offer an appropriate placement for the Adult Student during the 2021 – 2022 school year.  However, reimbursement for The Meadows is not an appropriate remedy in this instance.

20.    Compensatory education is a remedy designed "to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *Reid v. District of Columbia*, 401 F.3d 516, 524 (D.C. Cir. 2005), *cited with approval in R.P. v. Prescott Unif'd Sch. Dist.*, 631 F.3d 1117, 1125 (9th Cir. 2011). Compensatory education is not a contractual remedy, but an equitable one. "There is no obligation to provide a day-for-day compensation for time missed. Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." *Parents of Student W. v. Puyallup Sch. Dist.*, 31 F.3d 1489, 1497 (9th Cir. 1994).  Flexibility rather than rigidity is called for. *Reid v. District of Columbia, supra,* 401 F.3d at 523-524.  Compensatory education is an equitable remedy, meaning the tribunal must consider the equities existing on both sides of the case. *Reid v. District of Columbia, supra,* 401 F.3d at 524.

21.    Here, it is clear the Adult Student received very little education during the 2021 – 2022 school year, her senior year, due to her significant mental health issues and school refusal behaviors.  As a result, the Adult Student was unable to graduate in June 2022, as scheduled.  At that time, however, the District agreed to fund her placement at Transend, a therapeutic treatment facility, and to fund 1:1 academic instruction through Fusion, even though the Adult Student had already been enrolled for four years of high school.  The Adult Student remained at this placement until July 2023 and was able to earn sufficient academic credits to graduate high school and receive her diploma from the District.  This amounted to a year of therapeutic placement and 1:1 academics after the Adult Student would normally have graduated.  By all accounts, the Adult Student is currently doing very well.  She is working part time and will soon be starting college.  Compensatory education is intended to put the student in the position they would have been had FAPE been provided.  By providing the Adult Student with a therapeutic residential placement and 1:1 academics, allowing her to complete high school and gain a diploma, the Adult Student has already gained the educational benefits she would have received had the FAPE denial not occurred.

22.    The Parents also requested reimbursement of Dr. Fay's IEE and reimbursement for Dr. Pastor's private therapy as forms of compensatory education.  As stated above,

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0047
Docket No. 03-2023-OSPI-01824
8612 - OSPI
Page 30

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

the District has already compensated the Adult Student for the FAPE denial and no further relief is warranted.

**Whether the District materially failed to implement Student's IEP in 2022 by neglecting to offer an appropriate placement for 64 days**

23.    Parents argue the District erred by failing to implement the Student's April 2022 IEP until June 2022.

24.    Failures to implement an IEP violate the IDEA.  On the other hand, minor discrepancies between the services a school provides and the services required by the IEP do not violate the IDEA. See *Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811 (9th Cir. 2007).

> "[S]pecial education and related services" need only be provided "*in conformity with*" the IEP. [20 USC §1401(9)]  There is no statutory requirement of perfect adherence to the IEP, nor any reason rooted in the statutory text to view minor implementation failures as denials of a free appropriate public education.
>
> . . .
>
> We hold that a *material* failure to implement an IEP violates the IDEA.  A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP.

*Van Duyn,* 502 F.3d at 821 and 822 (italics in original).

25.    Reasonable delays incurred in implementing an IEP while a school district conducts assessments and negotiates with parents are not material. *See J.S. v. Shoreline Sch. Dist.,* 220 F. Supp. 2d 1175, 1189 (W.D. Wash. 2002) (finding that implementation delay that occurred at "behest of the parents ... was reasonable and was not ... error"); *cf. Tracy N. v. Haw. Dep't of Educ.,* 715 F. Supp. 2d 1093, 1112 (D. Haw. 2010) (finding that delay in determining student's educational placement was reasonable because there were "ongoing discussions regarding placement in response to [the student's mother's] concerns, a reassessment of [the student's] cognitive and academic skills, and a reevaluation of [her] behavior").

26.    Here, while there was a roughly two-month delay between the development of the Adult Student's IEP and her placement at Transend, the delay was reasonable and did not amount to a material failure to implement the IEP.  Given the Adult Student was over 18 years old, it was difficult for the District to find a residential placement that would provide therapeutic services and academic instruction.  The Parents worked

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0047
Docket No. 03-2023-OSPI-01824
8612 - OSPI
Page 31

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

closely with the District to research and find an appropriate placement for the Adult Student. Because of the Adult Student's age, she also had to consent to the chosen placement. Once Transend was selected as the Adult Student's placement and the District received approval from OSPI for the placement, the Adult Student was placed at Transend within 10 days.

27. Further, even if the two-month delay was determined to be a material failure to implement, the Adult Student has already been provided services sufficient to make up for any FAPE denial. As discussed above, the Adult Student was placed at Transend and Fusion for a year, and she was able to complete her academics sufficient to receive her high school diploma. The Adult Student is in the position she would have been had the District not denied her FAPE.

28. While the delay in placement was understandably frustrating to the Parents, it did not constitute a material failure to implement the Adult Student's IEP and did not amount to a FAPE denial.

**ORDER**

The Issaquah School District denied the Adult Student FAPE during the 2021 – 2022 school year by placing the Adult Student in an educational placement that was not reasonably calculated to meet her needs. However, the Parents have not proven that tuition reimbursement or compensatory education is warranted in this case. The Parents' requested remedies are **DENIED**.

SERVED on the date of mailing.

_Dana Diederich_

_____

Dana Diederich
Administrative Law Judge
Office of Administrative Hearings

## Right To Bring A Civil Action Under The IDEA

Pursuant to 20 U.S.C. 1415(i)(2), any party aggrieved by this final decision may appeal by filing a civil action in a state superior court or federal district court of the United States. The civil action must be brought within ninety days after the ALJ has mailed the final decision to the parties. The civil action must be filed and served upon all parties of record in the manner prescribed by the applicable local state or federal rules of civil procedure. A copy of the civil action must be provided to OSPI, Legal Services, PO Box 47200, Olympia, WA 98504-7200. To request the administrative record, contact OSPI at appeals@k12.wa.us.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0047
Docket No. 03-2023-OSPI-01824
8612 - OSPI
Page 33

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

DECLARATION OF SERVICE

I declare under penalty of perjury under the laws of the State of Washington that true copies of this document were served upon the following as indicated:

Adult Student/Parents                    via First Class Mail
17058 SE 47th Ct.
Bellevue, WA  98006

Ryan Ford                                via E-mail
Cedar Law PLLC                           ryan@cedarlawpllc.com
113 Cherry St.                           emma@cedarlawpllc.com
PMB 96563
Seattle, WA  98104

William T. "Bo" Johnson III              via E-mail
Bo Johnson Law LLC                       bojohnsonlaw@gmail.com
PO Box 361847
Hoover, AL  35236

Sharine Carver                           via E-mail
Issaquah School District                 carvers@issaquah.wednet.edu
5150 220th Avenue SE
Issaquah, WA  98029

Susan Winkelman                          via E-mail
Pacifica Law Group LLP                   susan.winkelman@pacificalawgroup.com
1191 Second Avenue, Suite 2000           grace.mcdonough@pacificalawgroup.com
Seattle, WA  98101

Dated March 7, 2024, at Olympia, Washington.

_____
Representative
Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489

cc:    Administrative Resource Services, OSPI